IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN DAVILA APONTE,

Plaintiff,

v.

DUPONT AGRICULTURAL CARIBE
INDUSTRIES, LTD.,

Defendant.

CIVIL NO. 13-1726 (CVR)

**OPINION AND ORDER**

**INTRODUCTION**

Plaintiff Juan Dávila Aponte ("Plaintiff" or "Dávila") brings this suit alleging discrimination on the basis of age under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*., the Americans with Disabilities Act ("ADA"), 42 U.S.C., sec. 12201 *et seq*., and various Puerto Rico discrimination statutes, seeking redress for Defendant Dupont Agricultural Caribe Industries, Inc.'s ("DACI") alleged discriminatory acts. Plaintiff avers DACI incurred in conduct constituting discrimination, harassment and retaliation by reason of age and disability.

Before the Court now is Defendant's Motion for Summary Judgment (Docket No. 24); Plaintiff's opposition thereto (Docket No. 30); and Defendant's reply to Plaintiff's opposition (Docket No. 34). Defendant petitions the Court to grant summary disposition of all of Plaintiff's claims, claiming first that most causes of action are time barred pursuant to National R.R. Passenger Corp. V. Morgan, 536 U.S. 101, 122 S.Ct. 2061 (2002). As to the hostile work environment, it posits that whatever is left after the time barred claims are excluded is not pervasive enough to constitute harassment, and thus cannot withstand

summary judgment.  Regarding the ADEA and ADA claims, Defendant avers Plaintiff cannot establish a *prima facie* case under either statute, as no adverse employment action occurred.  Finally, regarding the retaliation claims, DACI claims they too must be dismissed because they are time barred and no adverse employment action occurred.  Since no federal claims would remain alive, Defendant urges the Court to decline to exercise supplemental jurisdiction over the state claims.

Plaintiff counters arguing that summary disposition is unwarranted, as issues of fact remain as to all his claims.  Plaintiff further posits his claims are not time barred, because the employment actions taken against him were continuous.  Therefore, all claims fall under the continuing violation doctrine and the statute of limitations argument is inapplicable.

For the reasons explained herein below, Defendant's Motion for Summary Judgment is GRANTED. (Docket No. 24).

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56 (c).  Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st  Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. Id. Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." Id. At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also, Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not- genuinely controverted.' " Hernández, 869 F.Supp.2d at 7 (quoting Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary

judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c).   If they so wish, they may submit a separate statement of facts which they believe are in controversy.  Facts which are properly supported "shall be deemed admitted unless properly controverted."  Loc. Rule 56(e);  P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir.  2010) and Colón, 869 F.Supp.2d at 226.  Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril."  Hernández, 486 F.3d at 7.

## FINDINGS OF FACT

At the outset, the Court notes that Plaintiff's Opposition to Defendant's Statement of Uncontested Material Facts is procedurally non-compliant with the Local Rules.  As previously mentioned, Loc. R. Civ. P. 56 (c) specifically requires that the respondent either admit, deny, or qualify each of movant's proffered uncontested facts,  and for each denied or qualified statement, the non-movant must cite the specific part of the record which supports its denial or qualification.  The non-moving party if he/she so wishes, can prepare his/her own separate statement of issues of material fact which he/she deems are in controversy, and which preclude the entry of summary judgment. See Loc. R. Civ. P. 56 (c).

To begin with, many of Plaintiff's denials are non-compliant, insofar as they do not oppose the truth of the statement offered.  A review of Plaintiff's qualifications of Defendant's fact statements shows they are either irrelevant and immaterial to the matter at hand, or consist of mere "speculation, generalities, conclusory assertions, improbable

inferences, and, for lack of a better phrase, a lot of 'hot air.' " Domínguez v. Eli Lilly and Co., 958 F.Supp. 721, 728 (D.P.R. 1997).

For instance, Defendant's uncontested fact 43 stated:

> 43. In his 2010-2011 combined end-of-year performance evaluation, Dávila obtained a 2.7, only two decimal points below of what he obtained in his 2009 end-of-year performance evaluation.

Plaintiff's response was:

> Paragraph 43 of DSMF is qualified, since Dávila complained to Colón about the different actions and comments from Lefevre against him on December 1, 2011. Lefevre, whom was the officer that evaluated the plaintiff, rated Dávila's performance as 2.7, thus, rated the plaintiff as if he did not comply with some of the requirements for his position. Lefevre's action was in retaliation due to plaintiff's disability, requests for reasonable accommodation, and discrimination complaints, since the periods of time in which the plaintiff was on a leave, due to his medical condition and his medical appointments and for receiving medical treatment as well as for requesting reasonable accommodation and complaining to human resources, was taken into consideration by Lefevre at the time of rating plaintiff's performance as not meeting some of the requirements for his position. Lefevre, at the time that he discussed the evaluation with Dávila told him that due to his absences, his evaluation was negatively affected, and plaintiff's absences were related to his medical treatment. The plaintiff complained to human resources about the comments made by Lefevre.

Plaintiff's lengthy answer cannot serve to deny the fact that, at the evaluation for 2010-11, Dávila obtained a score of 2.7, which was 2 decimal points below his last evaluation. While it perhaps may serve to explain why Plaintiff believed this score was discriminatorily awarded (i.e. it was done in retaliation for his disability), he cannot deny

that the score given was just that, a 2.7, and that it was 2 decimal points below his last evaluation.

The same principle applies to, for example, Defendant's uncontested fact 50, which stated:

> 50. The Company reconvened with Dávila to discuss the outcome of its internal investigation. All findings were reviewed with the Plaintiff.

Plaintiff answers with:

> 50. Paragraph 50 of DSMF is qualified, since Dávila stated that Lefevre continued with his actions previously described against him, notwithstanding the alleged investigation conducted by Briselda Colón.

Whether or not Lefevre allegedly continued his discriminatory treatment after the investigation is irrelevant to proving or disproving whether the results of this investigation were discussed and reviewed with Plaintiff, which they were. Moreover, Plaintiff's objection to this fact (and most others) should have actually been part of a separate statement of uncontested facts that Plaintiff should have filed in this case in support of his opposition, but failed to do so.

As a result of this procedural mishap by Plaintiff, unless otherwise stated, many of the opposition statements are procedurally non-compliant and the Court deems admitted most facts from Defendant's Statement of Uncontested Material Facts pursuant to the Local Rules.

Finally, the Court notes that Plaintiff, as is customary in this District, filed the exhibits in the Spanish language and requested an extension of time to file the translations.

<u>Juan Dávila Aponte v. Dupont Agricultural Caribe Industries, Inc.</u>
Civil No. 13-1726 (CVR)
Opinion and Order
Page 7

<u>See</u> Docket Nos. 31 and 35.   Yet, when the translations were filed, they contain a certification by Lorraine Santiago, stating that she was  "fully bilingual in English and Spanish" and that "[s]hould any doubts arise as to the meaning or translation of original (sic), and agreement between the parties over a translation cannot be reached, the Court may resolve a review (sic) by an interpreter certified by the Federal Court Administration". <u>See</u> Docket No. 39-1.

Local Rule 5(g) requires that "[a]ll documents not in the English language which are presented or filed, whether as evidence or otherwise, must be accompanied by a certified translation into English prepared by an interpreter certified by the Administrative Office of the United States Courts." Loc. R.  5(g) (2009).  Plaintiff has failed to abide by this rule, insofar as the translations tendered were not performed by a certified Court interpreter. Therefore, none of these translations were considered for purposes of this Opinion and Order and they are hereby STRICKEN from the record.

With the above in mind, and pursuant to the parties' submissions, the Court deems the following facts uncontested.

1. DACI is a chemical manufacturing company located in Manatí, Puerto Rico that develops and manufactures crop protection and agricultural products, such as herbicides, fungicides, and insecticides.  D. Exhibit 1, page 1, ¶ 3.

2. DACI shares the Manatí site with an affiliate corporation, DuPont Electronics Microcircuits Industries, Ltd. ("DEMI"). D. Exhibit 1, page 1, ¶ 4.

3.   On May 6, 2002, Plaintiff Dávila, began working for DACI as "Support Technician III" in its Finance Department.  D. Exhibit 2, page 20, lines 21-25; and page 21, lines 1-7; page 34, lines 23-25; and page 35, lines 1-2.

4.   As part of his duties, Dávila had to prepare and file reports within a series of established dates.  D. Exhibit 2, page 10, lines 18-21.

5.   Some of the deadlines to complete his tasks were imposed by law and/or DACI's rules.  D. Exhibit 2, page 10, lines 22-25; and page 11, lines 1-12.

6.   The vast majority of the accounting assignments at DACI had specific deadlines.  It was standard and expected to work under pressure to complete the work on time. It was Dávila's responsibility to do his work on time and before the deadlines.  If Dávila did not complete his work on time, he could be reprimanded.  D. Exhibit 2, page 11, lines 13-25; and page 12, lines 18-20.

7.   It was Dávila's responsibility to inform his supervisor if he could not meet a deadline. This way his supervisor could take the necessary measures to ensure that the work could be completed on time. For example, Dávila's supervisor could authorize him to work overtime in order to finalize a task within the established deadline.  D. Exhibit 2, page 11, line 25; page 12, lines 1-10; page 14, lines 15-25; and page 15, lines 1-11.

8.   At all times relevant to the Amended Complaint, Jeannette Hernández ("Hernández") occupied the position of Site Finance Director, responsible for

the Finance Departments at DACI and DEMI.  D. Exhibit 2, page 33, lines 5-10.

9.    Hernández was born on July 26, 1958.  D. Exhibit 3, page 1, ¶ 4.

10.   At all times relevant to the Amended Complaint, Jorge Lefevre ("Lefevre") has occupied the position of Sr. Accounting Analyst at DACI. He was born on July 30, 1959.  D. Exhibit 1, page 2, ¶ 6; and Exhibit 3, page 1, ¶ 5.

11.   Lefevre has been Dávila's supervisor since 2002.  Before that, Dávila was supervised by Suzanne Rocafort ("Rocafort").  D. Exhibit 2, page 12, lines 7-10; and page 34, lines 10-22; and D. Exhibit 3, page 1, ¶ 6.

12.   Part of Lefevre's duties as the supervisor of the Support Technicians, including Dávila, was to verify they completed their work on time. As supervisor, Lefevre had to revise and approve Dávila's work. Therefore, Plaintiff could not finalize his work on the same date that it was due because he had to give Lefevre time to revise and approve it.  D. Exhibit 2, page 12, lines 21-24; page 13, lines 6-11, 20-25; and page 14, lines 1-6.

13.   Lefevre would ask that all the employees under his supervision, not only Dávila, provide a list of their assignments and the corresponding timeline to complete them, using a document titled "Role Timeline."  D. Exhibit 2, page 236, lines 1-25; and page 237, lines 1-9; and D. Exhibit 4.

14.   Lefevre is also responsible for the regular and proper attendance of all employees under his supervision, including Dávila, and thus, is expected to

Juan Dávila Aponte v. Dupont Agricultural Caribe Industries, Inc.
Civil No. 13-1726 (CVR)
Opinion and Order
Page 10

review as part of his ordinary supervisory activities, the weekly attendance records of all employees under his supervision.  D. Exhibit 2, page 69, lines 12-24; and D. Exhibit 3, page 1, ¶ 7.

15.   During the time Dávila worked at DACI's Finance Department, he was offered the opportunity to attend internal and external seminars, including tax related seminars.  D. Exhibit 3, page 2, ¶ 8; and Exhibit 5.

16.   DACI has a policy against discrimination and harassment on the basis of age and disability, among other protected categories.  DACI's Equal Employment Policy and Rules of Conduct also prohibit discrimination against an employee who complains about unlawful discrimination, files a charge of discrimination or participates in an employment discrimination case investigation or lawsuit.  The Human Resources Department has the overall responsibility regarding all the procedures of this policy.  This Department is also in charge of answering employee's questions or concerns. DACI will take disciplinary actions against any employee who violates this policy, which may include termination.  D. Exhibit 2, page 95, lines 16-25; page 96, lines 1-17; page 99, lines 23-25; and page 100, lines 1-12; D. Exhibit 6; and D. Exhibit 7.

17.   During his employment with DACI, Dávila received DACI's Equal Employment Policy and DACI's Rules of Conduct. D. Exhibit 2, page 95, lines

16-25; page 96, lines 1-17; page 99, lines 23-25; and page 100, lines 1-12; and

D. Exhibit 8.

### REORGANIZATION OF THE FINANCE DEPARTMENT

18.    Around 2008, the Manatí site began a reorganization of its Finance Department to improve its efficiency and reduce costs, and a series of centering and streamlining initiatives were implemented. Under this new operational model, a significant amount of the tasks and/or duties generally performed by DEMI and DACI's Finance Department were progressively outsourced to several business centers located in the United States, Spain (Asturias) and India (Hyderabad), among other places. D. Exhibit 2, page 25, lines 23-25; and page 26, lines 1-22.

19.    The reorganization of the Finance Department began around 2008-2009 and lasted until 2013-2014. D. Exhibit 2, page 29, lines 9-14.

20.    During this period of time, and as a consequence of the reorganization, the roles and responsibilities of all employees within the Finance Department were significantly impacted by the process. D. Exhibit 2, page 26, lines 23-25; page 27, lines 1-7; and page 29, lines 15-25.

21.    At the initial stage of the transition process, some employees, including Dávila, experienced a substantial, but temporary, increase in their workloads; not all tasks were outsourced immediately and the business centers outside Puerto Rico needed time to absorb and fully understand the particularities of

their newly assigned responsibilities.  D. Exhibit 3, page 2, ¶ 9.

22.    In 2009, Dávila's workload was reduced by transferring part of his work to the centers in Wilmington and Asturias, and by the closing of several legal entities that no longer required tax-related work from Plaintiff. In addition to reducing that part of his workload, DACI added to his role all the account reconciliations performed by former temporary employees.  D. Exhibit 3, page 2, ¶ 10; D. Exhibit 3-A and 3-B.

23.    In 2009, there were two other employees who occupied the same job classification as Dávila.  As a result of the restructuring, the job classification of Support Technician was eliminated in 2013.  As such, the positions of the three Support Technicians at DACI, including Dávila's, were eliminated.  D. Exhibit 2, page 30, lines 4-13; page 103, lines 19-21; page 104, lines 21-25; and page 105, line 1; and D. Exhibit 3, page 2; ¶ 11.

24.    Most of the duties performed by Support Technicians at DACI, including Plaintiff's, were taken outside of Puerto Rico, and others were distributed among existing DACI employees.  DACI did not hire other employees to perform the responsibilities of Dávila's position after it was eliminated. D. Exhibit 2, page 26, lines 19-22; page 27, lines 3-7; page 30, lines 4-16; page 104, lines 21-25; page 105, lines 1-25; and page 106, lines 1-9.

25.    Instead of terminating the employment of the individuals whose job classifications were impacted by the reorganization, DACI decided to offer

employment to these employees as positions became available and based on each employee's knowledge and experience. D. Exhibit 2, page 103, lines 22-25; page 104, lines 1-11; and page 284, lines 6-25; and Exhibit 9.

26. On November 11, 2013, Dávila was informed his position had been declared in excess and he would transition into the position of Production Control Clerk in the Product Delivery Area at DACI effective January 14, 2014. D. Exhibit 2, page 103, lines 19-21; page 104, lines 12-22; page 106, lines 10-17; page 284, lines 6-25; and page 285, lines 1-7, and D. Exhibit 9.

27. Dávila remains employed by DACI in the position of Production Control Clerk. D. Exhibit 2, page 106, lines 21-25.

28. Dávila received annual salary increases. It was not until Dávila changed to the position of Production Control Clerk in 2014 that his salary was reduced to the salary corresponding to that position. The salary transition was made within a period of nine months in intervals of three months from his prior salary level to his new one. D. Exhibit 2, page 284, lines 6-25; and page 285, lines 1-19; and D. Exhibit 9.

29. On December 26, 2012, Dávila filed his claim for discrimination with the EEOC.

DÁVILA'S PERFORMANCE

30. In November 2009, Dávila went to Hernández's office to discuss his concerns regarding his new responsibilities and DACI's expectations. At no time

during said meeting, did Dávila allege he felt discriminated against because of his age or alleged disability.  D. Exhibit 2, page 276, lines 6-25; and page 304, lines 14-20; D. Exhibit 3, page 2, ¶ 12; and D. Exhibit 10.

31.    Dávila experienced great difficulties handling his new tasks of reconciling the accounts, and particularly, in complying with the monthly reconciliation deadlines.  D. Exhibit 2, page 157, lines 20-23; D. Exhibit 3, page 2, ¶ 13; and D. Exhibit 10.

32.    Dávila had received training and materials regarding the reconciliation process.  D. Exhibit 2, page 257, lines 13- 25; page 258, lines 1-10; page 262, lines 1-25; and page 263, lines 1-17.

33.    Dávila also received feedback and follow-up with respect to his new account reconciliation tasks not only from Lefevre, but also from Rocafort.  D. Exhibit 2, page 247, lines 17-25; page 248, lines 1-25, page 249, lines 1-3; page 253, lines 2-12; page 265, lines 10-25; page 266, lines 1-25; page 267, lines 1-25, page 268, lines 1-25; page 269, lines 1-25; page 270, lines 23-25, and page 271, lines 1-25; D. Exhibit 11; D. Exhibit 12; D. Exhibit 13; D. Exhibit 14; D. Exhibit 15; and D. Exhibit 16.

34.    Lefevre also followed up with other employees under his supervision, such as Rolando Florido, regarding the status of their tasks.  D. Exhibit 2, page 270, lines 9-21; and D. Exhibit 17.

35.  Lefevre decided to provide Dávila with a monthly calendar which Plaintiff was supposed to fill with the tasks and the deadlines scheduled for each month. Said calendar was to be discussed with Lefevre at their monthly one-on-one meetings, and was intended to assist Dávila in managing his workload and time more efficiently.  D. Exhibit 2, page 157, lines 24-25; page 158, lines 1-25; and page 161, lines 8-23.

36.  Requiring an employee to submit a monthly calendar and to attend monthly one-on-one meetings is a method used by supervisors at DACI to improve employees' performance. Employees do not have to be under a formal Performance Improvement Plan or on disciplinary probation in order for a supervisor to use these methods.  D. Exhibit 1, page 2, ¶ 7.

37.  In his 2009 end-of-year performance evaluation, Dávila obtained a 2.9. According to the applicable scale, any employee with a numeric average between 2.9 and 3.5 met the requirements of his position.  D. Exhibit 2, page 42, lines 21-25; and page 43, lines 1-21; and D. Exhibit 18.

38.  In 2010, Lefevre did not prepare the end-of-year performance evaluations for the employees under his supervision. However, to catch up, Lefevre decided to combine several review periods in one performance evaluation. As such, the employees received a combined end-of-year performance evaluation.  D. Exhibit 3, page 3, ¶ 14.

Juan Dávila Aponte v. Dupont Agricultural Caribe Industries, Inc.
Civil No. 13-1726 (CVR)
Opinion and Order
Page 16

39.    Dávila testified employees are evaluated yearly and their evaluations are discussed the following year.  D. Exhibit 2, page 37, lines 17-25; and page 38, lines 1-3.

40.    Dávila never complained during 2011 that his 2010 performance evaluation was not prepared and/or discussed with him.  It was prepared and discussed with him in 2012.  D. Exhibit 2, page 39, lines 15-22.

41.    Dávila does not know if Lefevre had also failed to evaluate other employees.  D. Exhibit 2, page 40, lines 11-25; and page 41, lines 1-5.

42.    In 2012, Lefevre prepared a combined end-of-year performance evaluation covering Dávila's performance review during 2010 and 2011.  D. Exhibit 2, page 39, lines 1-13; and D. Exhibit 19.

43.    In 2006, Dávila was also evaluated for two consecutive periods covering January 1, 2005 through November 14, 2006.  D. Exhibit 2, page 100, lines 14-25; page 101, lines 1-25; and page 102, lines 1-6; and D. Exhibit 20.

44.    In his 2010-2011 combined end-of-year performance evaluation, Dávila obtained a 2.7, only two decimal points below of what he obtained in his 2009 end-of-year performance evaluation.  D. Exhibit 2, page 41, lines 15-18; page 42, lines 16-23; and page 43, lines 1-21; and D. Exhibit 19.

45.    According to the applicable scale, any employee with a numeric average between 2.1 and 2.8 met some of the requirements of his position.  The form indicates that "[p]erformance is satisfactory in most of the areas but needs to

improve in other areas." "He/she requires an automatic 90-day review. He/she is restricted to lateral or downward movements only".  D. Exhibit 19.

46.    DACI never prepared a formal Performance Improvement Plan for Dávila nor placed him on probation, as contemplated under DuPont's Human Resources Policy titled "Documenting Improvements Plans and Disciplinary Actions." D. Exhibit 1, page 2, ¶ 8; and D. Exhibit 2, page 166, lines 3-18.

47.    In his 2012 end-of-year performance evaluation, Dávila again obtained a 2.95, which meant he was meeting the requirements of his position. His supervisor indicated in his evaluation that the use of the calendar helped Dávila meet the deadlines to complete his work.  D. Exhibit 2, page 208, lines 2-25; page 209, lines 1-25; and page 210, lines 1-15; and D. Exhibit 21.

### MEETINGS WITH DACI H.R. DIRECTOR BRISEIDA COLÓN

48.    At all times relevant to the Amended Complaint, Briseida Colón ("Colón") occupied the position of Site Human Resources Manager, responsible for the Human Resources Department at DACI and DEMI.  D. Exhibit 1, page 1, ¶ 5; and D. Exhibit 2, page 224, lines 11-13.

49.    On December 1, 2011, Dávila visited Colón to complain about several incidents involving Lefevre. According to Dávila, he felt that Lefevre had unfairly canceled his vacation, made negative comments about him, and closely monitored his work and attendance. At no time during said meeting did Dávila denounce or even suggest that Lefevre's conduct was somehow

related and/or motivated by any discriminatory animus based on his age, alleged disability or alleged request for reasonable accommodation.  D. Exhibit 1, page 2, ¶ 9; and D. Exhibit 2, page 221, lines 24-25, page 222, lines 1-21; and page 224, lines 14-20.

50.    As a result of Dávila's complaints, DACI initiated an internal investigation, which included interviewing Lefevre to discuss Dávila's allegations. During Lefevre's interview with Colón, Plaintiff's supervisor provided Colón with well-reasoned and sound explanations for each of the issues raised by Dávila. D. Exhibit 1, page 2, ¶ 10.

51.    The Company reconvened with Dávila to discuss the outcome of its internal investigation.  All findings were reviewed with Plaintiff.  D. Exhibit 1, page 2, ¶ 11; and D. Exhibit 2, page 226, lines 4-9.

52.    In 2013, Dávila had several conversations with Hernández and Lefevre, in general, regarding his workload and DACI's expectations concerning Plaintiff's negative performance in some areas.  D. Exhibit 2, page 210, lines 17-25; page 211, lines 1-7; and page 254, lines 11-24 and D. Exhibit 22.

53.    After these communications between Dávila, Hernández and Lefrevre, Dávila returned to the Human Resources Department to complain about Hernández and Lefevre.  Colón interviewed Lefevre and Hernández, who provided Colón with well-reasoned and sound explanations for the issues raised by Dávila. As a result of the investigation, Colón concluded that no act of unlawful

discrimination, harassment or retaliation against the Plaintiff was committed by Lefevre and/or Hernández.  D. Exhibit 1, page 3, ¶ 13; and D. Exhibit 2, page 220, lines 3-25; and page 221, lines 1-9.

54.   Colón met with Dávila to discuss the outcome the investigation. All findings were reviewed with Plaintiff.  D. Exhibit 1, page 3, ¶ 14; and D. Exhibit 2, page 221, lines 10-25.

55.   David Méndez ("Méndez") occupies the position of Accounting Analyst at DACI's Finance Department.  He has never been Dávila's supervisor although he works with him very often.  D. Exhibit 3, page 3, ¶ 15; and D. Exhibit 2, page 35, lines 17-19.

56.   Dávila never complained to DACI about Méndez.  D. Exhibit 2, page 192, line 25; page 193, lines 1-11; and page 204, lines 10-15.

57.   In 2014, Dávila received a check from DACI issued to him by mistake. Plaintiff contacted Colón and requested that an investigation be made to verify why the check was issued to his name. Colón investigated the matter and provided the results of her investigation to Dávila. From the investigation, Colón concluded that it had been an unintentional error made by the employee who prepared the check and that Méndez was not responsible for this mistake.  D. Exhibit 1, page 3, ¶ 15; and D. Exhibit 1-A.

### DÁVILA'S MEDICAL LEAVES OF ABSENCE

58.   DACI's policy and procedures establish that employees returning from medical leaves of absence must report to DACI's infirmary, which is commonly referred to as "Medical," and must complete the process to return to work. Dávila had knowledge of this policy and of the process.  D. Exhibit 2, page 75, lines 18-25; page 76, lines 1-18; page 98, lines 15-25; and page 99, lines 6-21; D. Exhibit 23; and D. Exhibit 24.

59.   In 2004, Dávila went on a medical leave of absence. When he returned from the leave, he went to Medical. Dávila informed not having any medical restriction whatsoever, and was authorized to return to work. The Medical physician made the following recommendations: (1) Plaintiff could benefit from having an ergonomic chair; and (2) Plaintiff would benefit from changing his posture every 20-30 minutes.  D. Exhibit 2, page 153, lines 22-25, and page 154, lines 1-21; and D. Exhibit 25.

60.   At the beginning of 2010, Dávila went on a leave of absence because he had a back surgery.  D. Exhibit 2, page 156, lines 17-24.

61.   Upon Dávila's return to work from medical leave on March 5, 2010, the physician at Medical evaluated him and recommended that Plaintiff continue with the same medical recommendations he had since 2004. Dávila did not have any medical restrictions, and was authorized to return to work. D. Exhibit 2, page 156, lines 17-24, and D. Exhibit 26.

62.  DACI followed the physician's recommendations.  D. Exhibit 1, page 3, ¶ 16.

63.  Dávila has never requested any new reasonable accommodation to DACI.  He simply continued with the same recommendations he had since 2004, which were an ergonomic chair and to change positions every 20-30 minutes.  D. Exhibit 2, page 157, lines 3-14, and D. Exhibit 26.

64.  During all times relevant to the Amended Complaint, Dávila never went on an occupational-disability leave of absence or received treatment with and/or benefits from the State Insurance Fund Corporation.  D. Exhibit 1, page 3, ¶ 17.

DÁVILA'S ENJOYMENT OF VACATION AND SICK LEAVES

65.  DACI has in place general expectations that employees must meet before enjoying their vacation leave. These general expectations include, among others, that all employees in the Finance Department at DACI have to complete their assignments before taking vacation leave.  D. Exhibit 2, page 116, lines 14-25; page 117, lines 1-25, page 118, lines 1-25; page 119, lines 1-25; page 122, lines 1-13; page 123, lines 8-11; page 124, lines 3-11; page 130, lines 24-25; page 131, lines 1-24; page 132, lines 6-25; and page 133, lines 1-11; D. Exhibit 27; D. Exhibit 28; D. Exhibit 29; and D. Exhibit 30.

66.  Also, all reconciliations have to be completed and reviewed by the employee's resource or supervisor before leaving for vacation.  D. Exhibit 2, page 116, lines 14-25; page 117, lines 1-25, page 118, lines 1-25; page 119, lines 1-25;

page 122, lines 1-4; page 123, lines 8-11; page 124, lines 3-11; page 132, lines 6-25; and page 133, lines 1-11; D. Exhibit 27; D. Exhibit 28; and D. Exhibit 20.

67.     Dávila was informed and had knowledge of DACI's general expectations regarding vacation leave.  D. Exhibit 2, page 112, lines 17-21; page 116, lines 14-25; page 117, lines 1-25, page 118, lines 1-25; page 119, lines 1-25; page 122, lines 1-4; page 123, lines 8-11; page 124, lines 3-11; page 130, lines 24-25; page 131, lines 1-24; and page 132, lines 6-25; and page 133, lines 1-11; Exhibit 27; D. Exhibit 28; D. Exhibit 29; and D. Exhibit 30.

68.     On the few occasions that Lefevre did not approve or postpone Dávila's vacation, it was because Dávila had not completed an assignment before leaving, as required of all employees in the Finance Department.  D. Exhibit 2, page 109, lines 16-22; page 113, lines 1-23; page 114, lines 11-25; page 115, lines 1-25; and page 116, lines 1-10, and 14-25; page 117, lines 1-25, page 118, lines 1-25; page 119, lines 1-25; page 121, lines 1-25; and page 122, lines 1-4; D. Exhibit 31; and D. Exhibit 27.

69.     At all times relevant to the Amended Complaint, Dávila enjoyed his paid vacation leave. D. Exhibit 2, page 108, lines 1-25 and page 109, line 1.

70.     At all times relevant to the Amended Complaint, Dávila was able to use his sick leave and to make adjustments to his work schedule for medical appointments and personal matters, although Lefevre did comment on his absences.  D. Exhibit 2, page 142, lines 1-25; and page 143, lines 1-6.

71.   DACI's Vacation Policy establishes that vacation leave will be granted when management finds it most suitable, while "considering the desires of the employees and the efficient operation of the area concerned and the overall plant operations." D. Exhibit 2, page 97, lines 15-25, and page 98, lines 1-13 and D. Exhibit 32.

72.   Dávila received copy of DACI's Vacation Policy. D. Exhibit 2, page 97, lines 15-25, and page 98, lines 1-13; and D. Exhibit 33.

## LEGAL ANALYSIS

Before turning to the legal analysis of the issues in this case, Plaintiff has voluntarily dismissed his cause of action for age discrimination under federal law and Puerto Rico Law 100, 29 U.S.C., sec. 621 *et. seq*. and P.R. Laws Ann. tit. 29, §146, *et seq*. These two causes of action are hereby DISMISSED WITH PREJUDICE. The only causes of action remaining are those under ADA for discrimination, retaliation and several Puerto Rico discrimination statutes. The Court addresses them in turn.

### A.   Time Bar.

Defendant's first contention is that some of Plaintiff's claims are time barred, and that any claims occurring on or before March 1, 2012, or 300 days before the filing of his charge, are time barred. Plaintiff on the other hand alleges the continuing violation doctrine applies to his claims, and therefore all actions which fall outside of the 300 day time limit can therefore be considered. Although not a model of clarity, Plaintiff seems to argue that, because his claims are based upon an alleged hostile work environment, any

discriminatory conduct occurring outside of the statutory limitations period may be anchored to conduct within that period.

Regarding the ADA claims, it has long been held that prior to resorting to the courts for relief, plaintiffs must present their discrimination claims under Title VII to the appropriate agency. Jorge v. Rumsfeld, 404 F.3d 556  (1st Cir. 2005); Noviello v. City of Boston, 398 F.3d 76 (1st Cir.2005); Lebrón-Rios v. U.S. Marshal Service, 341 F.3d 7, 13 (1st Cir. 2003); Dressler v. Daniel, 315 F.3d 75  (1st Cir. 2003); Clockedile v. New Hampshire Dept. of Corrections, 245 F.3d 1 (1st Cir. 2001).  A cause of action under the ADA must be based on an administrative discrimination charge filed before the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged wrongful act; or, if a non-federal fair employment practices ("FEP") agency is authorized to investigate the charge, the charge must be filed with the EEOC or the FEP agency within 300 days of the alleged wrongful act. 42 U.S.C. § 12117(a).  The Puerto Rico FEP agency authorized to investigate and evaluate claims of discrimination based on disability is the Anti-Discrimination Unit of the Department of Labor and Human Resources ("ADU").  See 29 C.F.R. §§ 1601.13, 1601.14 and 1601.74.  Consequently, in Puerto Rico, a charge of discrimination must be filed with the EEOC or the ADU within 300 days of the alleged discrimination in order to be timely.

In the case at bar, it is undisputed that Plaintiff filed his charge of discrimination with the Puerto Rico Department of Labor's Anti-Discrimination Unit on December 26,

2012. Therefore, if the continuing violation doctrine does not apply, any and all claims occurring before March 1, 2012 would be time barred.

Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  This is because each discrete act starts a new clock for filing charges alleging that act; therefore, "the charge must be filed within the 180–or 300–day period after the act occurred." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).; see also Ledbetter v. Goodyear Tire & Rubber Co., Inc., 550 U.S. 618, 639, 127 S.Ct. 2162 (2007) ("Morgan is perfectly clear that when an employee alleges 'serial violations,' i.e., a series of actionable wrongs, a timely EEOC charge must be filed with respect to each discrete alleged violation.").  What  the continuing violation doctrine does is to allow a party to include in a discrimination charge allegations that would otherwise be time-barred if they can prove that the acts "are part of the same unlawful employment practice and at least one act falls within the time period." Morgan, 536 U.S. at 122.

On the other hand, hostile work environment claims do not turn on single acts but on an aggregation of hostile acts extending over a period of time. Marrero v. Goya of P.R., Inc., 304 F.3d 7 (1st Cir. 2002).  Therefore, in order to determine whether the claims at hand are time barred, the Court must first determine whether Plaintiff has made out an actionable hostile environment claim.

It has been well established that a plaintiff raising a continuing violation "must still show that 'the employer has engaged in enough activity to make out an actionable hostile environment claim.' " Malone v. Lockheed Martin Corp., 610 F.3d 16, 22 n. 12 (1st Cir.

2010) (*citing* Morgan, 536 U.S. at 117, 122 S.Ct. 2061).  Thus, in order to establish an

actionable hostile work environment claim, a plaintiff must show that the complained-of

conduct was " 'sufficiently severe or pervasive so as to alter the conditions of the plaintiff's

employment and create an abusive work environment.'" over a period of time.  Forrest v.

Brinker Int'l Payroll Co., LP, 511 F.3d 225, 228 (1st Cir.2007)); *see also*  Harris v. Forklift

Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993).  That environment "must be both

objectively and subjectively offensive, one that a reasonable person would find hostile or

abusive, and one that the victim in fact did perceive to be so."  Faragher v. City of Boca

Raton, 524 U.S. 775, 787, 118 S.Ct. 2275 (1998).

    Since there is no precise formula for establishing sufficiently egregious conditions,

the Court therefore examines all the attendant circumstances including the frequency of the

discriminatory conduct; its severity; whether it was physically threatening or humiliating,

or a mere offensive utterance; and whether it unreasonably interfered with an employee's

work performance.  Pomales v. Celulares Telefónica, Inc., 447 F.3d 79 (1st Cir. 2006).

### 1.    Vacation Leave.

    First in Plaintiff's list of grievances is the issue of his vacation leave, although the

Court notes that Plaintiff has admitted he took all his paid vacation leave for the times

comprised in the Amended Complaint.  See Uncontested Fact No. 68. Plaintiff thus

attempts to create a genuine issue of fact by alleging that, although he took the time, his

supervisor would cancel and/or change his scheduled vacation days. Plaintiff also admitted,

however that the company had a requirement that all employees had to complete their

assignments before enjoying their vacation leave, and that in the few occasions when his vacation was denied/postponed it was because he had not finished his pending projects, a policy that was applied across the board to all employees. See Uncontested Fact Nos. 64, 65 and 67.

When the few denials and/or changes of leave are considered in the context of Plaintiff's entire record, and having admitted that he took all his leave, DACI's actions cannot be said to be anything more than "a mere inconvenience." Allen v. Potter, 115 Fed.Appx. 854 (7th Cir. 2004); Griffin v. Potter, 356 F.3d 824, 829 (7th Cir. 2004).   Here, Plaintiff took some leave in 2010 ("some were cancelled and I took others", "after they cancelled my vacation, they assigned me other vacation days"; D. Exhibit 2, P. 108, l. 6-15.) took his vacation in 2011 (although the dates were changed), and otherwise took all his vacation.  Id. This is insufficient to create an adverse employment action.

Finally, as in Allen, supra, "[i]n nearly every instance, there were work related demands that apparently explained the employer's decisions."  Here, the company policy specifically stated that all assignments had to be competed before leave could be taken. Plaintiff cannot establish how this legitimate reason, which was uniformly applied across the board to all employees, was somehow discriminatory.

### 2.   Failure to Evaluate/Negative Evaluation.

Plaintiff next claims that his supervisor, Lefevre, failed to evaluate him in 2010. However, the evidence shows Lefevre also failed to evaluate other employees, and thus, no discriminatory animus can be established on the basis of this inaction.  Furthermore, the

act of not evaluating Plaintiff in 2010 (which incidentally, had also happened in 2006 and Plaintiff did not complain then) alone, cannot be considered an adverse employment action. See Marrero, 304 F.3d at 23 (stating that "the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.").

Plaintiff's next contention is that he was given a negative evaluation for 2010-11 when evaluated in January, 2012. He posits that he was given a 2.7 (which under company guidelines means that the employee "meets some expectations") and concludes that this score was because of his requested for medical leave and reasonable accommodation. Plaintiff contends the 2.7 he received, which was two decimal points lower then the 2.9 he had received in his previous evaluation, somehow had a negative impact on him and constituted an adverse employment action. However, this is also insufficient to establish an adverse employment action. See White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir.2008). ("A negative performance review unaccompanied by a change of position or a loss of pay is not an adverse employment action") and Fairbrother v. Morrison, 412 F.3d 39, 56-57 (2d Cir.2005) (surveying cases and finding that a negative evaluation was not materially adverse where the plaintiff did not evidence a detrimental effect on her salary, benefits, or title). No such evidence has been presented by Plaintiff here, as he retained the same salary, benefits and title.

While Plaintiff avers that, because he received a 2.7 in his evaluation he was placed on probation, he has provided no evidence to that effect. On the contrary, Defendant's plan

shows that a person receiving such a score *could* be placed on probation, but the documents before the Court do not evidence that this was actually done in Plaintiff's case. The plan further shows that such a person was restricted to lateral or descending movement[1] but Plaintiff has not alleged this evaluation restricted his movement in any way or that he was somehow demoted as a result of the score. Even worse, Plaintiff admitted he received salary increases after 2010 until his position was eliminated. <u>See</u> Uncontested Fact No. 28. Thus, no negative impact on his terms and conditions has been demonstrated.

Finally, the Court notes that, even though Plaintiff's position was declared in excess and eventually eliminated in 2013 due to the reorganization, he was offered another position within the company and not discharged. The Court finds it difficult to find discriminatory intent in these actions.

### 3.   Failure to be Considered for Internal Positions.

Plaintiff's next argument is that the company did not consider him for several positions which were available within the company.

Plaintiff admits that, for the first position he was interested in, it was eliminated, so no adverse action against him can be construed due to this. <u>See</u> D. Exhibit 2, pp. 61-62. For the second position, Plaintiff admits he was interviewed for it. <u>See</u> D. Exhibit 2, p. 67. Yet, Plaintiff has failed to put the Court in a position to rule in his favor, as he does not know who else was interviewed, the qualifications of the other applicants, how the other applicants compared to him or the reason why he was not selected. There could have been

---

[1] <u>See</u> D. Exhibit 28, p. 10.

many reasons why Plaintiff was not selected; for instance, perhaps a more qualified candidate was selected.  But the Court cannot determine, in a vacuum and without evidence, how DACI's selection of another person was discriminatory; to simply allege in a conclusory fashion, without more, that he was not hired for discriminatory reasons is not enough at this stage.  This argument is therefore unavailing to Plaintiff.

### 4. Discriminatory Remarks.

It has been well established that " '[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins,' " Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000)); *see also* Faragher, 524 U.S. at 788, 118 S.Ct. 2275 (stating that the hostile work environment standards are "sufficiently demanding to ensure that Title VII does not become a 'general civility code' ").

In the case at bar, the Court finds Plaintiff has failed to show that the comments were more than stray remarks of the workplace.  Plaintiff stated his supervisor, Lefevre, had mentioned to him  that the company had been good to Plaintiff instead of discharging him and that the company paid him too much money.  This is insufficient.  Although Plaintiff states repeatedly that the comments were "pervasive" and " constant", they are general and he has failed to show any particular instances of these constant comments.  At the summary judgment stage, more is needed than conclusory allegations.

Plaintiff further cannot show that discriminatory comments were made by the key decision makers or by those in a position to influence the key decision maker.  Plaintiff has not shown that Lefevre, Méndez or Hernández were in a position to dismiss him.  See

Ayala-Gerena v. Bristol-Myers-Squibb Co., 95 F.3d at 86, 96 (1st Cir. 1996) ("...direct evidence does not include stray remarks in the workplace, particularly those made by nondecision-makers or statements made by decision-makers unrelated to the decisional process itself.") and McMillan. Massachusetts Soc. for Prevention of Cruelty To Animals, 140 F.3d 288, 301 (1st Cir. 1998)(probativeness of stray remarks circumscribed if they were made by non-decision makers).

On the vague evidence before it, the Court cannot conclude that the comments were sufficiently severe or pervasive so as to alter the conditions of Plaintiff's employment and Plaintiff has not met his burden of so showing.

### 5. Increased Workload.

In 2008, and continuing through 2014, DACI underwent a reorganization in order to improve efficiency and reduce costs. Many duties were outsourced to Spain, India and the United States. Therefore, the responsibilities of all the Finance Department employees were significantly changed. Indeed, the Court agrees that a reorganization is a legitimate and bona fide reason for termination or for a change in an employee's work circumstances. See Lewis v. City of Boston, 321 F.3d 207 (1st Cir. 2002).

Plaintiff avers his workload was increased in 2008, but later reduced in 2009. During the time it was increased, he received training and materials regarding his tasks, feedback and follow up from Lefevre and Rocafort, another supervisor, and monthly one on one meetings were held with him to help him achieve his tasks. See Uncontested Fact Nos. 31, 32, and 34.

Although Plaintiff tries to create an issue of fact saying the deadlines and goals imposed by DACI were "unreachable", he admits he had plenty of help from DACI in order to meet them.  See Uncontested Fact No. 5. He further admitted the deadlines to complete his tasks were imposed either by his employer or by law, and were the same for all employees.  Plaintiff's workload increased, but so did the workload for other Finance Department employees.  Therefore, Plaintiff cannot show he was singled out by the company.

At the end of 2009, Plaintiff's evaluation was 2.9, which meant he met the requirements for his position.  For 2010, as previously stated, no evaluation was performed, and DACI instead performed a combined evaluation for 2010-11, where Plaintiff received a 2.7.  Despite the fact he could have been put on probation, he was not.  For 2012, Plaintiff again obtained a 2.95.  In the meantime, as previously discussed, there was no demotion or impact on his pay; quite the opposite, Plaintiff received several raises.  Therefore, the argument that, the increased workload somehow caused him an adverse employment action, is unfounded and, in any event, bolstered by the company's non-discriminatory reason for the temporary increased workload.

### 6.     Denial of Training and Seminars.

The Court gives short shrift to this argument, insofar as the evidence submitted by Defendant belies Plaintiff's self serving assertion that he was not invited to training and seminars.  See D. Exhibit 5.  Even if Plaintiff had been intentionally denied  participation in a training workshop, case law has held that such an action would not constitute the kind

of adverse employment action repudiated by the ADA.  A refusal by a supervisor to allow an employee's attendance at a workshop could constitute such an action if the employee could show that she experienced a material harm as a result.  See Colón-Fontanez v. Municipality of San Juan, 660 F.3d 17 (1st Cir. 2011) ("Colón must show she suffered material harm due to the delay"); and generally, Carmona-Rivera v. Puerto Rico, 464 F.3d 14 (1st Cir. 2006).  No such evidence has been presented by Plaintiff in this case.

### 7.      Required to Go to Medical.

Plaintiff also takes issue with the fact that he was told to report to Defendant's on site infirmary (referred to as "Medical"), every time he had to go to a medical appointment, and before he reported back to work in order to be allowed to start working. The complaint posits that "this is not a requirement imposed upon any other employee, when taking time off to go to his medical appointments".  Docket No. 4 at ¶39.

Defendant asserts this policy too, like the vacation policy, is a company requirement that is enforced across the board for all employees.  Plaintiff has failed to present any evidence to establish he was singled out by this treatment, and in fact, admitted this was the company policy, it was applied to all employees and he received a copy of the policy.  This argument is therefore unavailing to Plaintiff.

In sum, "[a]n adverse employment action in the context of a Title VII discrimination claim is a materially adverse change in the terms or conditions of employment because of the employer's actions." Kuhn v. Washtenaw Cnty., 709 F.3d 612, 625 (6th Cir. 2013) (internal quotation marks omitted).  Among them are termination, decrease in wage or

salary, change in title, diminished material responsibilities, or a material loss of benefits are all examples of a materially adverse change. Id. On this case record, the Court cannot find the actions complained of amount to adverse employment actions that meaningfully affected the conditions of Plaintiff's work.

While these facts may indicate perhaps an uncomfortable working relationship between Plaintiff and his supervisor, the actions Plaintiff describes are not sufficiently severe or pervasive to constitute a hostile work environment. See generally Rosario v. Dep't of the Army, 607 F.3d 241 (1st Cir.2010); Marrero, 304 F.3d 7; O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir.2001).

Furthermore, although Plaintiff describes a few instances where he was made fun of and was criticized by his supervisor, it has been held that "a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws." Lee-Crespo v. Schering-Plough Del Caribe, Inc., 354 F.3d 34, 46–47 (1st Cir. 2003). This is more evident here, where Defendant has evidenced that the deadlines, vacation policy and medical leave policy that Plaintiff complained about applied to everyone.

Even construing the facts in Plaintiff's favor, as the Court is required to do at this stage, the evidence does not support a hostile work environment claim. Although Plaintiff states the harassment occurred "frequently", except in a few instances he was unable to support his allegations with specific instances. The incidents described in the depositions are not frequent in nature; upsetting perhaps, but not severe. While not questioning the

discomfort such workplace interactions produce, these allegations are not sufficient to find that the behavior on the part of Defendant was " 'objectively and subjectively offensive … [behavior] that a reasonable person would find hostile or abusive.' " Noviello, 398 F.3d at 92 (*quoting* Faragher, 524 U.S. at 787); *see also* De La Vega v. San Juan Star, Inc., 377 F.3d 111, 118 (1st Cir. 2004) (holding that general claims of "humiliating and discriminatory treatment" did not provide evidence of harassment because they did not provide specific evidence related to the kind of harassment or frequency or the reasoning behind the alleged discriminatory treatment).

Lastly, the Court must note such acts do not appear to have affected Plaintiff's overall work performance; only in 2011, when his score was reduced by 2 decimal points and was again raised in the next evaluation. Even then, 2 decimal points when no other adverse reaction occurred can hardly be called detrimental.

Because the Court has found that Plaintiff has failed to prove a hostile work environment claim, the continuing violation doctrine cannot apply and the alleged discriminatory conduct that occurred before March 1, 2012 is time barred and cannot be considered. Furthermore, on the record as it stands, the Court finds that any conduct not barred by the statute of limitations is insufficient to support Plaintiff's hostile work environment claim. See Dávila v. State Insurance Fund,754 F.Supp.2d 351 (D.P.R. 2010). This cause of action is therefore DISMISSED WITH PREJUDICE.

**B.     ADA**.

A plaintiff may prove a discrimination case by presenting direct evidence of

discrimination or proving it indirectly by using the prima facie case and burden shifting methods that originated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817 (1973). <u>See also</u> <u>Ramos-Echevarría v. Pichis, Inc.</u>, 659 F.3d 182, 186 (1st Cir. 2011) (*quoting* <u>Katz v. City Metal Co.</u>, Inc., 87 F.3d 26, n. 2 (1st Cir.1996)).

 A plaintiff alleging disability discrimination must first establish, as part of his *prima facie* case, that he was "(1) disabled within the meaning of the ADA; (2) qualified to perform the essential functions of her job with or without a reasonable accommodation; and (3) discharged or otherwise adversely affected in whole or in part because of his disability." <u>Jones v. Nationwide Life Ins.</u>, 696 F.3d 78, 86-87 (1st Cir.2012). Once the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to put forth a legitimate, non-discriminatory reason for its adverse employment decision and to produce credible evidence in support of its non-discriminatory reason. <u>Freadman v. Metropolitan Property and Caves. Ins. Co.</u>, 484 F.3d 91 (1st Cir. 2007). If the defendant offers such a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff to put forth evidence proving that the defendant's reason is "mere pretext, cloaking discriminatory animus." <u>Freadman</u>, 484 F.3d at 99.

 For purposes of this motion, Defendant has conceded that Plaintiff meets the first two prongs of the test - that he was disabled and that he was able to perform the essential functions of his job. Defendant avers, however, that Plaintiff cannot meet his burden on the third step. The Court agrees.

According to the aforementioned case law, in order to prove his *prima facie* case, Plaintiff has to establish that he suffered some sort of adverse employment action as a result of his disability, and that the change materially affected the conditions of his job. For the same reasons espoused in the preceding section, the Court finds that Plaintiff has failed to establish that Defendant's actions adversely affected him because of his disability.

The First Circuit has explained that "[a]dverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000)(*quoting* Hernández-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir.1998)).  On this record, the Court cannot find that any of these actions occurred in this case.

"Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Marrero, 304 F.3d at 23  The Court finds that this is the case here.  While Plaintiff has raised some issues regarding his workplace that he is unhappy with, that does not transform them into a Title VII case.  This cause of action is therefore DISMISSED WITH PREJUDICE.

## C.    Retaliation.

In order to make out a *prima facie* case of retaliation, Plaintiff must prove that (1) he engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity.

Hernández-Torres, 158 F.3d at 47.  While it is undisputed that Plaintiff engaged in protected conduct by Title VII when he filed his EEOC claim, again, Plaintiff's retaliation claims must fail because he cannot evidence that he suffered an adverse employment action as a result of Defendant's conduct - or any other conduct, for that matter.

The retaliation claim poses another problem for Plaintiff, insofar as the cutoff date for this cause of action is even shorter - 180 days.  Even though Puerto Rico is a deferral jurisdiction and a plaintiff can file a charge of discrimination with the EEOC within 300 days after the alleged unlawful employment practice occurred, the EEOC has not conferred the Anti-Discrimination Unit in Puerto Rico with jurisdiction to hear claims for retaliation under Title VII.  Therefore, a claimant has 180 days, not 300 days, from the alleged unlawful employment practice to file a charge of retaliation under Title VII with the EEOC. See Levine-Diaz v. Humana Health Care, 990 F.Supp.2d 133 (D.P.R. 2014); and Rivera Abella v. Puerto Rico Telephone Co., 470 F.Supp.2d 86 (D.P.R. 2007).  Thus, only actions that occurred after June 29, 2012 can be considered for purposes of this cause of action.  After examining what little is left of Plaintiffs' claims, the Court finds they cannot survive summary judgment.

As part of Defendants' retaliatory conduct, Plaintiff raises the issue of the seminars, which pursuant to the above analysis, the Court finds was unsupported by the evidence and is time barred.  The excessive workload allegation (2009, 2011) is time barred, as were the allegations of negative actions after his back operation (March, 2010), failure to be considered for other positions (2010), the alleged negative evaluation (January, 2012) and

the complaints to Human Resources (December, 2011 and  March, 2012).  Although Plaintiff avers that, when he asked for time off for medical appointments, there was "always a problem" (See Docket No. 30, p. 18), Plaintiff has not established that Defendant prevented him from going to the appointments.  And in fact, it seems Plaintiff took extended medical leave on several occasions. See Uncontested Facts Nos. 58 and 59.

All that is left then is an allegation that Hernández threatened to fire Plaintiff in March, 2013, which is three months after the filing of his discrimination charge.  This span of time is too long to establish that these actions were causally related.  See Centro Médico del Turabo v. Feliciano de Melecio, 406 F.3d 1, 10 (1st Cir.2005) (explaining that while disciplinary action after engaging in protected conduct is indirect proof of a causal connection, the causal connection disappears in the lapse of time); Bishop v. Bell Atlantic, 299 F.3d 53 (1st Cir. 2002) (if temporal proximity is the only evidence of causality establishing prima facie retaliation, proximity must be "very close"); and Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004)(noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity").

Plaintiff then attempts to create an issue of fact by implying that his "multiple" requests for reasonable accommodation triggered the alleged discriminatory negative reactions by Defendant.  This claim also cannot lie.

Defendant has established that the 2010 request for accommodation was the same as the 2004 request- an ergonomic chair and Plaintiff should get up every 20-30 minutes

and change positions.   While Plaintiff contends he made "numerous requests" for accommodation (Docket No. 30 at 16), yet the only evidence the Court can find on the record is Plaintiff's medical certificate dating back to 2004, which was reinstated in 2010. The petitions for medical leave, which Plaintiff equates with asking for reasonable accommodation, were all granted.  If any further accommodation was requested, it is not evident from the record.

"The request for accommodation must be sufficiently direct and specific, giving notice that she needs a special accommodation." Calero-Cerezo, 355 F.3d at 23 (*quoting* Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001); see also Kiman v. New Hampshire Dept. of Corrections, 451 F.3d 274, 283 (1st Cir. 2006) (actual request needed to trigger a reasonable accommodation duty).   No other requests for reasonable accommodation were presented on the record in the case and the ones that were actually made, were all granted.

Based on the record before the Court, the Court cannot find any retaliation occurred. Therefore, this cause must be DISMISSED WITH PREJUDICE.

## IV.   State Law Claims.

Plaintiff also filed claims under the Puerto Rico law counterparts to the federal claims, as well as for damages under Puerto Rico law.  When federal claims are dismissed before trial, state claims should be dismissed as well, but such is not a mandatory rule to be applied inflexibly in all cases.  Rather, the court should exercise informed discretion when deciding to assert supplemental jurisdiction over state law claims. Carnegie-Mellon

Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614 (1988); Rosado v. Wyman, 397 U.S. 397, 403-05, 90 S.Ct. 1207 (1970); Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-57 (1st Cir. 1996).

Since no federal claims remain as above discussed, the Court declines to exercise jurisdiction as to the pendent state claims filed against all Defendants. Thus, the state claims are DISMISSED WITHOUT PREJUDICE.

## CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment (Docket No. 24) is GRANTED. Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 2nd day of September, 2015.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE